**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0516n.06

No. 09-2156

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Aug 16, 2010**

LEONARD GREEN, Clerk

DONNA WITKOP, Personal Representative of    )
the Estate of Martin Witkop, Deceased,    )
    )
    Plaintiff-Appellant,    )
    )   ON APPEAL FROM THE UNITED
v.    )   STATES DISTRICT COURT FOR THE
    )   EASTERN DISTRICT OF MICHIGAN
UNITED STATES OF AMERICA,    )
Department of Defense, United States Air    )
Force and Michigan Air National Guard,    )
    )
    Defendant-Appellee.    )

Before: GILMAN and COOK, Circuit Judges; and OLIVER, District Judge.[*]

COOK, Circuit Judge. In this suit brought under the Federal Tort Claims Act ("FTCA"), Plaintiff-Appellant Donna Witkop, the appointed personal representative of the estate of Martin Witkop ("decedent"), alleges that wake turbulence generated by Defendant United States of America's military aircrafts caused the decedent's floatplane to crash. The district court granted summary judgment in favor of United States of America, finding that Witkop failed to establish a prima facie case of negligence. We agree and affirm.

---

[*]The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

I.

On November 15, 2006, Air National Guardsmen piloted three A-10 Thunderbolt jets on a low-altitude training mission that took them over Michigan's Wixom Lake. The pilots flew a triangular route, from Battle Creek to Wixom Lake, then to the Steelhead Military Operating Area ("MOA"), and, finally, back to Battle Creek. Colonel David Augustine, the only pilot to remember the flight, testified that the jets likely maintained an airspeed of 250 to 300 Knots Indicated Airspeed and an altitude between 500 and 1,000 feet. The pilots departed at 2:16 p.m. and returned at 3:35 p.m., with Augustine estimating that the jets flew over Wixom Lake between 2:38 p.m. and 2:50 p.m. Visibility and weather conditions were good, and Augustine did not observe any other aircraft between Battle Creek and the MOA.

That same afternoon, the decedent piloted a Maule MX-7-108B floatplane from a Midland, Michigan, airport to Wixom Lake, where he intended to practice water landings and takeoffs. His plane crashed, however, and a witness found the floatplane upside down in the lake. The accident occurred at approximately 3:17 p.m., the time at which the floatplane's clock stopped.

Three witnesses observed either the jets or the floatplane or both. Carol Oullette and Raymond Bauers recalled seeing the jets at approximately 3:15 p.m. when they returned to their home, situated a few hundred yards from Wixom Lake. Both noticed the low altitude of the military jets, with Bauers comparing the jets' altitude to that of a "crop-duster" airplane. Neither observed a floatplane. While hunting approximately three miles south of Wixom Lake, Thomas Limberg

observed both the jets and the floatplane pass overhead between 2:30 p.m. and 3:00 p.m. According to Limberg, the floatplane proceeded on the same path as the jets, but trailed them by approximately five to ten minutes.

Every plane generates wake turbulence as a natural consequence of flight. Relying on the testimony of Oullette and Bauers, who recalled seeing the jets at approximately 3:15 p.m., Witkop theorizes that the decedent encountered wake turbulence created by the three military jets—which were flying below an altitude of 1,000 feet—and that this turbulence caused the decedent's 3:17 p.m. crash.

## II.

The FTCA provides a limited waiver of the federal government's sovereign immunity, granting federal courts exclusive jurisdiction over tort claims where "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the alleged negligent acts occurred in Michigan, that state's substantive law controls. Under Michigan law, a negligence action requires proof of four elements: (1) a duty owed to the plaintiff by the defendant; (2) breach of that duty; (3) causation; and (4) damages. *Brown v. Brown*, 739 N.W.2d 313, 316–17 (Mich. 2007).

The district court granted summary judgment for the United States, holding that Witkop failed to identify an applicable duty that the military pilots owed to the decedent and, even assuming

the existence of such a duty, failed to prove that wake turbulence from the military jets proximately

caused the accident.  We review the district court's grant of summary judgment de novo, affirming

if the evidence, viewed in the light most favorable to Witkop, demonstrates that no genuine issue of

material fact exists and that the United States is entitled to judgment as a matter of law.  *Village of*

*Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 377 (6th Cir. 2008) (citing *Matsushita Elec.*

*Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A.     Duty

Before the district court, Witkop argued that the military pilots flew too low in violation of

Mich. Comp. Laws § 259.80e and Federal Aviation Regulation ("FAR") 14 C.F.R. § 91.119,[1] both

of which require airplanes to maintain an altitude of 1,000 feet when flying over a "congested area."

While the state statute and FAR establish a general duty of care for pilots, the United States can be

liable only if its pilots violated a duty owed to the decedent.  *Fultz v. Union-Commerce Assocs.*, 683

N.W.2d 587, 590 (Mich. 2004).  The district court found that Witkop advanced no authority for the

proposition that the statute or regulation were "intended to benefit the decedent or intended to govern

flight risks between aircraft."  *Witkop v. United States*, No. 08-10886-BC, 2009 WL 2242438, at *6

(E.D. Mich. July 23, 2009).  Indeed, the authority establishes the contrary: Mich. Comp. Laws §

259.80e identifies "persons and property *on the surface*" as the protected class, (emphasis added),

---

[1] This regulation parallels § 5.10.3 of the General Flight Rules promulgated by the Air Force.

No. 09-2156
*Witkop v. United States of America*

and 14 C.F.R. § 91.119 similarly aims to protect "*persons on the ground*." FAA Legal Interpretation 1979-57, 1979 WL 395494, (D.O.T. Oct. 3, 1979) (emphasis added).

On appeal, Witkop points to no authority contradicting the express language of the state statute or regulatory history and, instead, argues—for the first time—that the pilots owed the decedent a common law duty of care. We decline to address this forfeited argument. *Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1299 (6th Cir. 1992) (party may not raise arguments that were not raised below, even if different arguments were made on the same issue); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) ("This Court will not decide issues or claims not litigated before the district court."). Absent an actionable duty owed to the decedent, Witkop's negligence claim fails.

B.      Proximate Cause

Assuming Witkop identified an actionable duty, she still cannot satisfy her burden with respect to another element: causation. The government argues that the jets' recorded takeoff time of 2:16 p.m. and landing time of 3:35 p.m. reveal that they did not play a role in the crash. According to pilot Augustine, traveling at 290 knots, the jets would have reached Wixom Lake, some 98 nautical miles away from Battle Creek, at approximately 2:38 p.m. The wake turbulence simply could not have contributed to the crash, the government reasons, because the jets left Wixom Lake at least 30 minutes before the accident occurred at 3:17 p.m.

Urging reversal, Witkop contends that a question of fact exists as to the timing of the military jets' Wixom Lake flyover. On this score, Witkop is correct—Augustine and Limberg placed the jets over the lake between 2:30 and 3:00, while Oullette and Bauers fixed the jets' flyover time at 3:15. But even crediting the testimony of Oullette and Bauers in order to fit Witkop's theory, the causal connection between any wake turbulence and the crash remains "unacceptably tenuous." *Witkop*, 2009 WL 2242438, at *7.

Defense expert George Greene, who previously served as the FAA's Chief Scientific and Technical Advisor for wake turbulence, determined that wake turbulence from an A-10 could remain potentially hazardous to a floatplane like the decedent's for 1 to 1.5 minutes. But Limberg, the only witness to see both the jets and the floatplane, offered uncontested testimony that the jets flew 5 to 10 minutes ahead of the floatplane. Moreover, Limberg recalled that the floatplane flew above the jets. Thus, "proceeding at a lower altitude, the jets would have generated wake turbulence below the level of the floatplane" and that wake turbulence would have descended and dissipated over time. *Id.*

Witkop relies solely on the affidavit of airplane pilot expert Dale Leppard to support her theory that wake turbulence caused the crash. Leppard concedes that the jets "could not have traveled over Wixom Lake at 3:15 p.m., then flown to the MOA, and then back to base in time for [their] recorded landing time," but speculates that the jets flew over Wixom Lake after they left the MOA, an opposite route from what pilot Augustine described. Leppard Aff. ¶ 15. While Leppard's

theory comports with Oullette's and Bauers's flyover time of 3:15, it conflicts with the testimony of pilot Augustine and all three witnesses—Limberg, Bauers, and Oullette.[2] Even if we credit testimony suggesting that the jets and the floatplane flew over the lake at or near the same time, there is no evidence that the jets flew above the floatplane, or were in sufficiently close proximity to create turbulence causing the floatplane to crash. Moreover, although Leppard attacks the opinions rendered by wake turbulence expert Greene, he advances no alternative calculations of wake-turbulence severity or rate decay and points to no evidence linking wake turbulence to the crash. Without any supportable explanation as to how the decedent encountered wake turbulence generated by the military jets, Witkop cannot raise her theory of causation beyond the level of speculation; therefore, her claim cannot survive the government's motion for summary judgment. *Jordan v. Whiting Corp.*, 240 N.W.2d 468, 471 (Mich. 1976) ("The mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two.").

## III.

We affirm the judgment of the district court.

---

[2] Limberg testified that the jets flew over him heading north toward Wixom Lake (not south toward Battle Creek), and in the same direction as the floatplane; Bauers and Ouellette testified that the jets came from the south (not the east), flew over the lake, and turned east toward Saginaw Bay (not south toward Battle Creek)